IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No.  4:06-CR-177 |
| | : | |
| Plaintiff, | : | (Judge Jones) |
| | : | |
| v. | : | |
| | : | |
| RANDY ALBERTSON, | : | |
| | : | |
| Defendant. | : | |

## ORDER

## December 11, 2006

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion to Suppress ("the Motion") (doc. 23) filed by Defendant, Randy Albertson ("Defendant" or "Albertson"), on July 12, 2006.  For the reasons that follow, the Motion will be denied.

## PROCEDURAL HISTORY:

On May 11, 2006, the Grand Jury for the Middle District of Pennsylvania returned a two-count Indictment against Randy Albertson.  (See Rec. Doc. 1).  In Count One, he was charged with Knowingly Receiving Material Containing Child Pornography, as Defined in 18 U.S.C. § 2256(8), That Had Been Transported in Interstate or Foreign Commerce by a Computer, in violation of 18 U.S.C. § 2252A(a)(2)(B), and in Count Two, he was charged with Knowingly Possessing

1

Child Pornography, Having Reason to Know That It Had Been Transported in Interstate and Foreign Commerce by a Computer, in violation of 18 U.S.C. § 2252A(a)(5)(B).  (Rec. Doc. 1).  On October 12, 2005, the Grand Jury returned a Superseding Indictment charging Albertson with the same, but expanding the dates in which Defendant allegedly possessed child pornography to January 1, 2003, through January 27, 2006.  (Rec. Doc. 58).  We note that Defendant has been detained since May 15, 2005 (see docs. 11, 18, 35, 72), and Defendant has pleaded not guilty to the charges (see doc. 70).

On July 12, 2006, Defendant filed the instant Motion to Suppress (doc. 23), which has been briefed by the parties.  On September 5, 2006, this Court conducted an evidentiary hearing on the Motion.  (See Hearing Transcript, Sept. 5, 2006 ("H.T.")).  At the conclusion of the proceedings, the Court permitted counsel to file supplemental briefs, which will be referred to in our analysis.  Having received those supplements (docs. 55, 64), the record is now closed and the matter is ripe for our review.

At the evidentiary hearing, the Government called Defendant's estranged wife Trudy Albertson ("Mrs. Albertson") and Joseph Wondoloski, a criminal investigator with the Bloomsburg Police Department, as its witnesses.  (See H.T.).  Defendant called Scott Sotack, a Pennsylvania State Police Trooper, as his witness.

2

(See H.T.).

## FACTUAL BACKGROUND:

Prior to Defendant and Mrs. Albertson's marriage in August of 2003, they lived together. (H.T. 5:7-20, 18:1-1-3). Two of Mrs. Albertson's daughters from a prior relationship, Britney and Deserae, lived with the Albertsons in Bloomsburg, Pennsylvania. (H.T. 6:1-11). Defendant's three sons from a prior relationship did not live with them. (H.T. 8:21-25, 9:1-4).

In or about February of 2003, Defendant and Mrs. Albertson decided to purchase a computer that "the kids" could use to do schoolwork. (H.T. 6:16-24, 15:13-19). Accordingly, on February 12, 2003, Defendant purchased a Gateway computer ("the Gateway" or "the computer") using his MBNA credit card. (H.T. 7:1-12, 17:2-8; Ex. D-1). Upon receipt of the credit card bill, Defendant paid it. (H.T. 7:15-18).

After the Gateway arrived, it was set up in the dining room of the soon-to-be Albertsons' home. (H.T. 8:16-18). It was also set up for Internet access. (H.T. 7:19-21). Internet access through AOL was free for the first year that the Albertsons had the Gateway, and after that, Mrs. Albertson paid for Internet service through a cable company. (H.T. 7:22-25, 8:1-6). Thus, from approximately 2004 until at least September 5, 2006, the date of the evidentiary

hearing, Mrs. Albertson paid for the Albertsons to have Internet access via the Gateway.  (H.T. 8:1-13).  Initially, the Internet was available to everyone in the house, and they all had passwords that they used to access it.  (H.T. 9:5-8, 21:11-15).

Throughout the years that the Albertsons have had the Gateway, the entire family has had access to it.  (H.T. 8:19-20).  Indeed, Defendant now concedes that the Gateway "was kept in the dining room of the Albertson home and was accessible by the entire family . . . ."  (Rec. Doc. 55 at 2).

Mrs. Albertson's daughters Britney and Deserae used the computer for school work, and Defendant's sons used the Gateway when they visited the Albertsons' home.  (H.T. 9:2-20, 11:4-7).  Over the years, Mrs. Albertson personally observed at least Defendant, herself, her daughters, and two of Defendant's sons using the Gateway.  (H.T. 9:9-17).  The testimony is clear and consistent: Mrs. Albertson, among many others, used the Gateway.  (H.T. 9:9-17, 11:4-7, 23:4-5).

In April or May of 2005, Britney and Deserae told Mrs. Albertson that Defendant had been viewing adult pornography on the Gateway.  (H.T. 19:18-22, 20:2-14).  Also around that time, Mrs. Albertson also found a picture, in Defendant's dresser, of a naked girl whom Mrs. Albertson approximated to be

4

thirteen (13) or fourteen (14) years old.  (H.T. 27:25, 28:1-6, 29:4-10).  The picture

had been printed from the computer.  (H.T. 28:1).  Mrs. Albertson knew that the

picture and the computer were connected because written at the top and bottom of

the paper was information about the website from which the picture had been

taken.  (H.T. 31:11-24).

In response to her daughters' report and her own observation of the picture

in Defendant's drawer, Mrs. Albertson talked with Defendant about the situation

and then denied Defendant access to the computer, or at least the Internet.  (H.T.

9:21-25, 10:1-9).  Mrs. Albertson, Britney, and Britney's boyfriend effectively

terminated the password-protected account that Defendant had used to access the

Internet.  (H.T. 10:2-6, 21:16-20).

At or about the end of October of 2005, the Albertsons moved, but remained

in Bloomsburg.  (H.T. 10:17-21).  Defendant, Mrs. Albertson, and her two

youngest daughters, Britney and Deserae, continued their residence together.  (H.T.

9:11-14, 10:23-25).  As they had in their prior home, the Albertsons set up the

Gateway in the dining room area of their new home.  (H.T. 11:2-3).

However, after the Albertsons' October 2005 move, Mrs. Albertson saw not

only herself, her two daughters, and two of Defendant's sons using the computer,

but also Defendant, because at some point, Defendant was once again permitted

access to the Internet.  (H.T. 11:4-7, 12:17-20).  Defendant's account was not

reinstated.  Rather, family members signed onto the Internet using their own user

name and password and then allowed Defendant to use the computer.  (H.T. 12:21-

22).  Once in a while, Mrs. Albertson signed onto the Internet for Defendant, but

mostly Deserae or Britney did.  (H.T. 13:5-8).  This happened frequently, probably

on a daily basis.  (H.T. 13:1-4).

In January of 2006, Mrs. Albertson noticed a difference in the relationship

between Defendant and her daughter, Deserae.  (H.T. 11:8-11).  Mrs. Albertson

discussed her observations with Deserae, and based on that conversation, contacted

the Bloomsburg Police Department.  (H.T. 11:12-17).  Mrs. Albertson also moved

herself and her two daughters out of the Bloomsburg home that they had been

sharing with Defendant.  (H.T. 12:6-11).  Mrs. Albertson took personal belongings

and the computer with her.  (H.T. 12:12-13).  Defendant never contacted Mrs.

Albertson to ask her to return the computer.  (H.T. 13:20-23).

After contacting the Bloomsburg Police Department, Mrs. Albertson was

interviewed by Lieutenant Wondoloski.  (H.T. 32:4-5).  Mrs. Albertson told

Lieutenant Wondoloski about her daughters' observations of Defendant viewing

adult pornography.  (H.T. 19:18-24).

Following Lieutenant Wondoloski's initial interview of Mrs. Albertson, they

6

spoke on a number of other occasions.  (H.T. 32:2-5).  Both Mrs. Albertson and

Lieutenant Wondoloski testified that at some point during these subsequent

discussions, Mrs. Albertson told the officer about the picture of the naked minor

that she had observed in Defendant's dresser.  (H.T. 27:12-19, 33:17-23).  Mrs.

Albertson had also indicated that the picture had been printed from the computer.

(H.T. 34:7-9).  Also at some point during these discussions, Lieutenant

Wondoloski asked Mrs. Albertson to bring the Gateway into the police department,

and she brought in its tower.  (H.T. 14:3-10).  Just as he never asked Mrs.

Albertson to return the Gateway, Defendant never asked the police to return it

either.  (H.T. 13:24-25, 14:1-2, 39:20-23).

    At some point after she brought in the Gateway's tower, Mrs. Albertson was

asked to consent to a search thereof.  (H.T. 35:22-25).  Both Mrs. Albertson and

Lieutenant Wondoloski's testimony makes clear that Mrs. Albertson's consent to

search was obtained sometime after their discussion about the picture of the naked

minor and its origin.  (H.T. 27:12-19, 28:17-18, 33:17-23).  On January 31, 2006,

Mrs. Albertson signed the Consent to Search Property form that she was presented.

(H.T. 14:23-25, 15:1-7; Gov't Ex. 1).  Lieutenant Wondoloski also signed the

Consent to Search Property form.  (H.T. 15:10-12).

    The Gateway's tower was then turned over to Pennsylvania State Police

Trooper Sotack, who conducted a forensic examination of the hard drive.  (H.T. 38:23-25, 39:1-6, 43:20-23).  He was instructed to look for child pornography. (H.T. 44:2-5).

Trooper Sotack's forensic examination of the Gateway's hard drive confirmed Mrs. Albertson's testimony that Defendant initially had an Internet access account on the Gateway, but later it was removed.  (H.T. 44:2-8, 49:22-25, 50:1-8, 54:22-25).  At the time of Trooper Sotack's search, there was no user account that included the name "Randy."  (H.T. 49:22-25).  However, a keyword search of the name "Randy" revealed approximately 300,000 hits.  (H.T. 50:1-2). Based on these results, Trooper Sotack concluded that "Randy was . . . a previous account holder on that computer.  So somewhere prior to the reinstallation of Windows was there [sic] an account for Randy, such as Britney and Deserae."[1] (H.T. 54:21-25).

Trooper Sotack's forensic examination of the Gateway's hard drive also confirmed that the computer was used to view child pornography.  Thirty-nine (39) images of child pornography were found -- thirty (30) were found in the temporary Internet history and nine (9) were found in lost files.  (H.T. 48:21-25, 22:1-3).  All

---

[1] Trooper Sotack explained that on January 3, 2006, Windows had been reinstalled on the Gateway, reformatting the hard drive and causing some, but not all, of the data on it to be overridden.  (H.T. 54:2-14).  The reason for and/or motive behind such reinstallation is not dispositive to the instant Motion, and thus, not considered here.

of the images in the temporary Internet history were found under Deserae's

account.[2]  (H.T. 49:4-7).

Trooper Sotack's further inquiry into the lost files appears to more

definitively link Defendant to child pornography images.  The Trooper's search of

the lost files returned some 300,000 hits, some of which included Internet cookies,

data inserted onto a computer's hard drive by a web site to allow faster

accessibility the next time a computer is directed to that web site.  (H.T. 50:3-4).

The name of the account holder visiting the sites is included in the cookies.  (H.T.

55:1-4).  Trooper Sotack provided a few examples of the cookies found on the

Gateway that included the name "Randy":

"Randy@www.pornoza.com/free/preteen-models;" "Randy@http://www.cyber-

lolita.net;" and "Randy@www.pornoza.com/free/cjout."  (H.T. 50:8-14).  Trooper

Sotack indicated that child pornography is found on those sites.  (H.T. 50:15-19).

## DISCUSSION:

Defendant moves this Court to enter an order suppressing all of the

information garnered from the search of the Gateway's hard drive.  (Rec. Doc. 23

---

[2] The Court notes Mrs. Albertson's plausible explanation of how these images could have been viewed and/or obtained by Defendant despite them being attached to Deserae's account, which is that Defendant in effect "pirated" her password when she logged on for him.  (H.T. 22:10-22).  However, another explanation is equally as plausible: Deserae logged onto the Internet for Defendant and then simply walked away or left the home, leaving Defendant on the Internet unsupervised.  Either of these contingencies would serve to explain how the images landed in Deserae's account.

at 2).  Defendant argues that his Fourth Amendment rights were violated when the hard drive of the computer that he purchased, an item in which he allegedly had a reasonable expectation of privacy, was searched without his consent.  (See Rec. Doc. 55 at 4).

Defendant supports his Motion with several arguments.  Prior to the evidentiary hearing, Defendant's primary arguments were that the Gateway was his personal property and that the Albertsons were having marital difficulties, rendering Mrs. Albertson's consent to the search invalid and the search illegal. (See Rec. Doc. 29).  However, Defendant's post-suppression hearing submission was focused on two different arguments: 1) because allegedly neither Mrs. Albertson nor any other family members had access to, or control of, the Gateway's hard drive, Mrs. Albertson's consent to a search thereof was invalid and the search was illegal; and 2) because the Consent to Search Property form was allegedly vague, referring to a "Gateway Computer" rather than the Gateway's hard drive, it did not effectively authorize the search, rendering it illegal.  (See Rec. Doc. 55 at 4, 7).

In response, the Government asserts that property law is not determinative to this inquiry.  (Rec. Doc. 34 at 3).  Rather, the Government argues that the law regarding the validity of consent to search turns on the mutual use of or joint

access to the property.  (Rec. Doc. 34 at 3).  The Government notes that the

testimony demonstrates that the Gateway was kept in the dining room of both

Albertson homes, accessible by the entire family, and used by Mrs. Albertson.

Accordingly, because Mrs. Albertson had at least joint access to, and mutual use

of, the Gateway, Defendant assumed the risk that Mrs. Albertson would consent to

a search thereof.  (Rec. Doc. 64 at 3).  Further, the Government argues that the

"Gateway computer" referenced in the Consent to Search Property form includes a

variety of items, including the tower and the hard drive within it.  (Rec. Doc. 64 at

5).

   We initially note that the governing jurisprudence of the Fourth Amendment

to the United States Constitution is the logical starting point in our analysis of

Defendant's Suppression Motion.  The Fourth Amendment provides:

>   The right of the people to be secure in their persons, houses, papers, and
>   effects against unreasonable searches and seizures, shall not be violated, and
>   no Warrants shall issue, but upon probable cause, supported by Oath or
>   affirmation, and particularly describing the place to be searched and the
>   persons or things to be seized.

U.S. CONST. amend IV.

   However, consent is a well-recognized exception to the Fourth

Amendment's prohibition against warrantless searches.  See Schneckloth v.

Bustamante, 412 U.S. 218, 222 (1973) (citing Katz v. United States, 389 U.S. 347

(1967); Vale v. Louisiana, 399 U.S. 30 (1970)) (noting that "a search conducted

pursuant to a valid consent is constitutionally permissible."). For the exception to

apply, consent must be freely and voluntarily given, see Schneckloth, 412 U.S. at

222, by either the individual whose property is to be searched or a third party who

possesses common authority over the property. See Illinois v. Rodriguez, 497 U.S.

177, 181 (1990) (citing United States v. Matlock, 415 U.S. 164 (1974)).

In Matlock, the Supreme Court considered whether a woman, who

represented to the police that she was either the defendant's wife or cohabitant, had

authority to consent to a search of their bedroom. The Court held that the woman's

consent was legally sufficient to admit the evidence uncovered in the

aforementioned search, id. at 177, and noted:

> Common authority is, of course, not to be implied from the mere property
> interest a third party has in the property. The authority which justifies the
> third-party consent does not rest upon the law of property, with its attendant
> historical and legal refinements, but rests rather on mutual use of the
> property by persons generally having joint access or control for most
> purposes, so that it is reasonable to recognize that any of the co-habitants has
> the right to permit the inspection in his own right and that the others have
> assumed the risk that one of their number might permit the common area to
> be searched.

Id. at 171 n.7.

Cases relying on Matlock abound, including in the Court of Appeals for the

Third Circuit. See, e.g., Bolden v. Southeastern Pennsylvania Transp. Auth., 953

12

F.2d 807 (3d Cir. 1991). In <u>Bolden</u>, the Third Circuit recognized that "consent may be provided by . . . third parties with <u>substantial interests or responsibilities</u> related to the search or seizure. These third parties include, among others, a party with <u>common authority</u> over the premises or item to be searched . . . ." <u>Id.</u> at 827 (emphasis added). Accordingly, the Third Circuit held that a union may validly consent to terms and conditions of employment that implicate employees' Fourth Amendment rights. <u>Id.</u>

The Third Circuit's reasoning in <u>Bolden</u> is applicable here: Mrs. Albertson was a third party with substantial responsibility for, as well as common authority over, the Gateway. As the person who has paid the monthly Internet service provider's bills from sometime in 2004 until the present, Mrs. Albertson is responsible for ensuring that the computer remains fully operational. Moreover, despite Defendant's purchase of the computer prior to he and Mrs. Albertson's marriage, Mrs. Albertson shared at least common authority over it with Defendant. The computer was located in a common area of the Albertsons' homes, the dining room, and although Defendant initially had his own password-protected Internet account, Mrs. Albertson actually terminated that account after discovering that he was viewing child and adult pornography on the computer.

Further, we find a non-binding case upon which the Government relies,

United States v. Morgan, 435 F.3d 660 (6th Cir. 2006), persuasive in light of the

general factual similarities between the facts underlying it and the facts of our case.

As is the situation here, in Morgan, a wife who suspected that her husband was

viewing child pornography on a computer located in a common area of their home

consented to a search of the computer's hard drive, and child pornography was

found.  Id. at 661-62.

A few factual distinctions exist between the facts in Morgan and those here.

For example, in Morgan, the wife installed a spyware program that captured

images of the computer screen every ten (10) seconds.  Id. at 662.  Her husband

had also installed a program related to his online activities: an Internet eraser

program.  Id. at 664.  In addition, when the wife confronted her husband with her

knowledge of his online activities, a domestic dispute ensued, to which the police

were called.  Id. at 662.  Upon arrival at the scene, a police officer reviewed a

consent form with the wife, who signed the form.  Id.  Based upon the wife's

signed consent, as well as the computer's location in a common area of the house

to which the wife had access, and the wife's representations that she occasionally

used the computer and that she and her husband did not have individual user names

or passwords, the police searched the computer's hard drive.  Id.

The Court of Appeals for the Sixth Circuit held that the warrantless search

was constitutional because of the wife's apparent authority to consent to the search, based on the location of the computer and her representations as to her own use of the computer and her and her husband not having individual user names or passwords.  Id. at 664.  However, the lack of individual accounts and passwords in Morgan and presence of them here is not sufficient to distinguish Morgan because even assuming arguendo that here, Defendant's password for the Internet afforded him some expectation of privacy and rendered Mrs. Albertson without actual authority to consent,[3] courts must inquire as to whether the third party who consented had apparent authority to consent at the time the search began, and Mrs. Albertson did.  Id.

Mrs. Albertson's consent is valid because she had apparent authority to consent to a search of the Gateway when the search began.  At the time of the search, the computer had been removed from its location in an area accessible to the entire family; Mrs. Albertson had used the computer; she had been paying the Internet provider bills for nearly two years; and she had at least common authority over the computer.  Indeed, for at least seven or eight months, from approximately April or May of 2005 until January of 2006, Mrs. Albertson had been regulating

---

[3] As will be discussed in detail below, this Court finds that Defendant had no such privacy interest in the Gateway's hard drive.

Defendant's own access to the Internet because she had deprived him of his initial password-protected Internet access.  Clearly Mrs. Albertson had the requisite apparent authority to consent to a search of the Gateway.

Additionally, we note that we have thoroughly considered Defendant's arguments, but we find them unavailing.  First, we consider Defendant's pre-evidentiary hearing arguments: 1) the Gateway was his personal property; and 2) the Albertsons were having marital difficulties.

Defendant's initial Brief in Support of the Motion argued that "this computer was not jointly owned property nor was it a 'family' computer, but was the personal and private property of the Defendant . . . ."  (Rec. Doc. 29 at 4).  However, Defendant's purchase of the Gateway is irrelevant in light of Rodriguez, 497 U.S. at 181, and Matlock, 415 U.S. 164.  Moreover, both Mrs. Albertson and Trooper Sotack's testimony at the hearing refutes Defendant's argument that the Gateway was not a "family" computer.  (H.T. 8:19-20, 9:5-8, 21:11-15, 49:22-25, 54:22-25).  Many members of the Albertson family had accounts for, and used, the Gateway.  (H.T. 9:2-20, 11:4-7, 23:4-5, 49:22-25, 53:5-25, 54:22-25).  Indeed, Defendant's own Supplemental Brief concedes that the computer was kept in the dining room of the Albertsons' homes and accessible by the entire family.  (Rec. Doc. 55 at 2).

16

Further, Defendant's pre-evidentiary hearing argument that Mrs. Albertson could not consent to the search because of the Albertsons' marital difficulties also fails.  (See Rec. Doc. 29 at 3-4).  Defendant cited no authority in support of this argument, and this Court finds the argument unpersuasive in light of the precedent discussed above, none of which was affected by whether the parties had marital difficulties.

Second, we consider Defendant's post-evidentiary hearing arguments: 1) because allegedly neither Mrs. Albertson nor any other family members had access or control of the hard drive within the Gateway, Defendant had a reasonable expectation of privacy in its contents, and Mrs. Albertson's consent to search of it was invalid and the search illegal; and 2) because the Consent to Search Property form was allegedly vague, referencing a "Gateway Computer" rather than the Gateway's hard drive, it did not effectively authorize the search, rendering it illegal.  (See Rec. Doc. 55 at 4, 7).

We begin with Defendant's argument that he had a reasonable expectation of privacy in the Gateway's hard drive.  (Rec. Doc. 55 at 4).  Not unlike many households across this country, the Albertsons' household had a computer connected to the Internet that was shared by many family members.  Although the family members used the computer for different purposes, for reasons discussed in

17

greater detail below, it can be reasonably inferred from the testimony that they all used the computer in a fashion that implicated the hard drive.  When using the hard drive, the information stored thereon was scattered throughout the hard drive.  Data from each account accessing the Internet is not stored on separate hard drives.  Thus, the Albertson's hard drive was necessarily mutually and jointly accessed by everyone using the computer.

Defendant's argument that none of his family members used the Gateway's hard drive is unavailing and frankly absurd under the circumstances.  Defendant urges this Court to make two inconsistent assumptions.  First, Defendant argues: "Although Trudy Albertson did not testify as to what components of the Gateway computer system were used by these individuals, it can be assumed that they at least used the keyboard and monitor."  (Rec. Doc. 55 at 5-6).  Within the same paragraph, Defendant later argues:

> There being no testimony as to the use of the hard drive, this Court cannot conclude that the hard drive was an item of mutual use to which the entire family had joint access.  It is just as possible to conclude that the family members of the Defendant operated the computer using only the CD Drive, DVD Drive, Disk Drive or possibly a Zip Drive and not the hard drive.

(Rec. Doc. 55 at 6) (emphasis in original).

In fact, it is not just as possible for this Court to reach such a conclusion.  First, Defendant's argument that in this technological age, other members of his

18

family would use the Gateway's keyboard and monitor without accessing the Internet, is simply incredible.[4]  Second, we note that Mrs. Albertson testified that the Gateway was purchased so that the children could do school work on it (H.T. 6:16-24, 15:13-19), making it highly likely that family members other than Defendant used the computer's hard drive to store their files.  Moreover, to the extent that they were not storing data intentionally, the mere fact that they on occasion "surfed" various web sites would in and of itself have triggered deposit of electronic data on the hard drive by individuals other than Defendant.

Thus, Defendant's argument that he had a reasonable expectation of privacy in the Gateway's hard drive fails because Mrs. Albertson had at least "mutual use" of, as well as "joint access or control" to, the hard drive.  Matlock, 415 U.S. at 171 n.7.  Accordingly, as the Supreme Court has held, Defendant "assumed the risk" that Mrs. Albertson would permit the hard drive to be searched.[5]  Id.

---

[4] The Court is by no means an expert with respect to the inner workings of computers. However, the testimony on this matter confirms to our satisfaction that when a computer user accesses the Internet, the hard drive is involved.  (H.T. 50:1-14, 55:1-4).  Because of the implication of Defendant's suggestion, that he was the only member of the family accessing the Internet, we find his argument incredible.  Indeed, the testimony demonstrates that many of Defendant's family members, including Mrs. Albertson – "Mommy," had Internet access accounts and used them.  (H.T. 9:2-20, 11:4-7, 23:4-5, 49:22-25, 53:5-25, 54:22-25).

[5] The Court further notes that it has reviewed the non-binding authority Defendant cites in support of the proposition that he had a privacy interest in the Gateway's hard drive. However, as the Government aptly noted, all of the cases cited are factually distinguishable from the instant matter.  See United States v. Barth, 26 F. Supp. 2d 929, 936-37 (W.D. Tx. 1998) (a repairman to which the defendant entrusted his computer, who was also a confidential FBI

Defendant's final argument, that the Consent to Search Property form, which refers to the "Gateway computer" rather than its hard drive, is too vague, rendering the consent invalid and the search illegal, also fails.  (See Rec. Doc. 55 at 7).  As the Government indicated, the definitions section of the title under which Defendant has been charged refers readers to the definition of "computer" provided in 18 U.S.C. § 1030:

> An electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

18 U.S.C. § 1030.  This definition clearly encompasses a variety of items, including a computer's hard drive.

Accordingly, we hold that Trooper Sotack's search of the Gateway's hard drive did not violate the Fourth Amendment because Mrs. Albertson provided valid consent for the search thereof.  As Mrs. Albertson paid the Internet service provider bills for the computer for more than two years, used the computer herself,

---

informant, acted as a law enforcement agent by searching the defendant's computer); United States v. Villarreal, 963 F.2d 770, 773 (5th Cir. 1992) (a drug dog was used to examine two opaque, sealed drums, which were then opened without a warrant).  See also United States v. Runyan, 275 F.3d 449 (5th Cir. 2001) (the court focused on whether police exceeded the scope of a private party search when searching materials that the defendant's wife turned over after she conducted a search of a locked building on she and the defendant's property).

and for at least seven or eight months, controlled Defendant's own access to the computer, she had at least joint access to, and mutual use of, the computer and its hard drive, rendering her consent to a search thereof valid under the Constitution. Matlock, 415 U.S. at 171 n.7.  Therefore, we hold that the search performed by Trooper Sotack was constitutional, and we decline Defendant's request to suppress any of the information gained from it.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.     Defendant's Motion to Suppress (doc. 23) is **DENIED**.


s/John E. Jones III
John E. Jones III
United States District Judge